Case number 20-1015, Cross Refined Coal, LLC et al. v. Cmsnr of Internal Revenue, Appellant. Ms. Bringer for the appellant, Mr. Bishop for the appellees. You may proceed, Ms. Bringer. Thank you, Your Honor. Bringer? Bringer, yes, that's correct, Your Honor. Thank you. Good morning, and may it please the court. My name is Nora Bringer, and I represent the Cmsnr of Internal Revenue in this appeal. The issues the Commissioner raises on appeal concern the organization of Cross Refined Coal as a partnership. It is especially tempting to abuse the partnership form to transfer tax benefits among taxpayers. So partnerships come under special scrutiny for federal tax purposes. This appeal is not about whether Cross engaged in actual business activities that qualified for refined coal credits. The IRS agrees that it did, and that AJGC, which had all of the non-tax upside from Cross, and the lion's share of the downside, may claim the tax benefits from Cross. A key element in a partnership, the Supreme Court tells us in the Tower case, is that there is a community of interest in the profits and losses. Here, there was not... Your argument was that Gallagher had the lion's share of risk. And I'm not sure what the lion's share, lion's share has a as long as the other partners had a material risk of losing their investment or a significant portion of it, would that suffice? Or could it still be considered an improper partnership for tax purposes? Well, Your Honor, the Culbertson test is a holistic test, looks at all of the facts and an important piece of... I'm focusing on your lion's share argument. Yes, Your Honor. So an important piece of that is the downside risk. It's not the whole story, but it is an important piece of that. And here, the tax court grossly overstated the amounts that Fidelity and Schneider had at risk in Cross. But if they had, just under my question, let's just, apart from this case, the lion's share may well be in one partner. But if the other partners have a material risk of losing substantial amounts of their investment. Your Honor, a material risk is... I'm sorry. Would that be, I know no one factor is dispositive. But for your concern here, where you're not challenging, you're only challenging two other factors. What role does it play if they have material risk, but someone else has most of the risk? Your Honor, partners certainly can have differing levels of Here, the concern is that on the risk side, the balance was so out of balance, especially compared to the anticipated tax benefits that Fidelity and Schneider anticipated out of this partnership, that the risk at the end of the day is more like de minimis. But a material risk would weigh in favor of a partnership. That's true, even if there was an imbalance in risk among the partners. The other side of the coin, though, on the economic upside, we acknowledge that Fidelity and Schneider had some level of risk. The commissioners never argued that there was no risk in their investment in Cross. The argument is rather that there's this huge imbalance between the downside risk and the anticipated tax benefits. But on the upside of the story, looking at the business operations of with an upside potential from the underlying business of refining coal. In the Culbertson case, the Supreme Court told us that whether a partner enjoys the fruits of the partnership is strongly indicative of the reality of his participation in the enterprise. The historic boardwalk and the TIFD case in Chemtech, those circumstances jump in back on again, this risk. Yes. I'm sure I'm not going to pronounce it right. But there was, they went into, I believe, two of these partnerships simultaneously. Three, is it right? Three? Three, yes. And one of them, was it Jyfries? Jyfries? Jyfries, I believe. Passed Jyfries. Do you dispute that they lost, they've lost money and lost their investment? They made no profit at all under that one? Well, the facts of this case are really focused on the Cross partnership. That is the only partnership at issue here. Do you dispute what happened in that partnership, which was doing the same thing as this one? No, Your Honor, but a critical piece is that the, the protections with respect to the initial investments, in particular, for Fidelity were quite different in those partnerships. With respect to Cross, Fidelity had liquidated damages provisions that didn't have that in the Jyfries? I don't believe so, Your Honor. I'm not certain about that. But I don't believe so. I'm sure counsel for the other side can answer that question. But if, if they did. Your Honor, there certainly was some downside risk in these partnerships. The Commissioner doesn't dispute that. The issue is rather that, on the one hand, the tax court grossly overstated the amount of risk. And given how important that was to the tax court case here, and to looking at the overall partnership, the errors of the tax court on the downside... I'm trying to get to this grossly overstated when we know they, they lost, it looks like everything on the Jyfries partnership. And, and at the time, I take it we look at the time they entered into the partnership. Is that the... Well, Your Honor, certainly the question is, what was their intent in entering the partnership? And when they entered the cross partnership, Schneider thought, based on projections from HHEC, that a $7 million investment would result in $140 million of tax benefits. Everything went perfectly for 10 years. Yes, that's correct, Your Honor. And Fidelity had... And what evidence was there that everything would go perfectly for 10 years, at the time they entered into the partnership? Well, Your Honor, the evidence in the record about what the, what the investors anticipated would happen, is their internal documents projecting the anticipated upside from these partnerships. There's not evidence in the record. Did those projections describe it as sort of a best case or hoped for scenario? Or did they say this is kind of a lock? So the projections from HHEC, the tax board did describe them as a best case scenario. Fidelity's projections included a range of minimum production and maximum production for about $100 million to about $150 million. But either way, as the tax court found, they anticipated very high returns from this. Now, on... Why is that a problem in a case like this, where, as you say, the IRS is not contesting that there are actual transactions going on, right? I mean, a number of our cases talking about the relationship of the economic substance or where there's not, where there's sort of sham transactions, but here no one disputes that there was actually coal that was refined, and then sold and used to produce energy, right? So you have the actual activity that Congress sought to incentivize. And so why exactly should we be focusing on, you know, the various economic decisions that the partners made about the type of risk to undertake? Well, Your Honor, there is no dispute here that Cross did refine coal and did sell that coal to Santee Cooper. That's absolutely right. But economic substance is not sufficient to sustain the validity of a partnership. This court was very clear about that in the ASA Investorings case, even if there was economic substance there, that wasn't enough to save the partnership. In the Southgate Master Fund case, the Fifth Circuit put it this way, that the sham partnership analysis focuses solely on the question of whether there was a non-tax business purpose that necessitated the partnership's existence. So the question here is not, did Cross actually refine coal? The question is, were Fidelity, Schneider, and AJGC truly partners in that underlying business of refining coal? We've discussed the downside... We found that Gallagher sought out partners, found as a matter of fact that Gallagher sought out partners for the purpose of spreading its investment risk. This is on JA 1794. Spreading its investment risk over a larger number of projects, not exceeding its parents' company limited appetite for coal, allowing Gallagher to learn from lessons spreading across facilities, you can learn from what's going wrong in one aspect, the other, and to expand its royalty earnings on the ChemMed technology. You haven't challenged those factual findings. No, you're right. That's correct. We haven't. So as to Gallagher was looking for partners for legitimate non-tax reasons, correct? So the tax court found that Gallagher was looking for entities to share its risk, but Fidelity and Schneider did not... Let me ask this one more time. So Gallagher was looking for partners for legitimate business reasons, non-tax reasons? It is what the tax court found, and we don't challenge that in appeal. So we're taking that as a given. And then the district court, or sorry, the tax court also found that these other Fidelity and Schneider came in and did due diligence and kept themselves updated on all types of information and were being involved in what was going on with the refining of this cleaned up coal. They weren't just sort of passively mailing it in. You don't dispute those facts, do you? No, we don't, Your Honor. But the fact that they got wiped out on one of the three partnerships. You don't dispute that fact. That's correct, Your Honor. But focusing here on what happened with Crest... Schneider didn't have the protection, the liquidated damages protection that Fidelity did. You don't dispute that either. That's correct, Your Honor. They had different provisions in their membership purchase agreements. Fidelity and Schneider had stuck with this partnership for its 10-year term. They'd stuck with it despite everything that was going on. They would have lost money. Do you dispute that? Your Honor, there's no support in the record for that conclusion. So no one was buying any more coal. They were just paying expenses, ongoing operating expenses. No one was buying the coal. It stopped. Well, that's not correct, Your Honor. It's my understanding, and I believe this is in the record, that Crest did eventually begin refining coal again after Fidelity and Schneider exited. How long after? If I go back to... How long after? I'd have to get you the specific date, Your Honor. I believe it was in 2014, but I'm not certain. And I'm not sure what year of the part, that 10-year period. What was the 10-year period? So Fidelity and Schneider exited in 2013. They began refining coal in 2010. But Fidelity and Schneider didn't join... Did they continue refining this from 2014 on? Your Honor, that's not in the record, and I don't know. So the government didn't show that, in fact, had they stuck with it, they would have gotten all these profits, or at least the lower end of their projections? No, Your Honor, the government didn't show that, but neither did Crest, which bore the burden of proof here to show that the IRS's determination was incorrect. If I may, Your Honor, I recognize that I'm into my time, but if I may make a couple of points on the upside. So Fidelity and Schneider didn't join Crest to share in Gallagher's risk. Sorry, before we go to upside, can I ask you another question about downside? Absolutely. So as I understand, your theory is that Fidelity and Schneider didn't really have much skin in the game, and the way you reach that conclusion is by saying, ignore all of their contributions that were made in months, one month after the tax credit had been realized, because they knew they were going to get some benefit. But I mean, that's the benefit of 2020 hindsight. When they enter into the partnership, they do what partners always do, which is they make a commitment to fund the operating expenses on a pro rata basis, and they're on the hook for that. And if there's a good month, they'll happily do it because it'll produce a profit. If there's a bad month, they're still on the hook for funding the expenses, as they had to do in many months where they were losing money. So why don't we look to the scope of the commitments they made when they formed the partnership, instead of ignoring all of the expenses that were funded in months that turned out to be successful? Your Honor, if you want to look at what the partners understood they were getting into with respect to the operating expenses, there are excellent examples of this in Fidelity's internal documents, and this is at page 1480 of the appendix. In December 2009, on the cusp of formalizing its investment in CROSS, Fidelity wrote that the ongoing operations expenses were a contingent liability that exists only if qualified tax credits are produced. And it also said these expenses would be paid quarterly in arrears as the tax credits are generated. So these operating expenses, Fidelity knew from the beginning, would be paid in arrears, and the amount of money committed in the absence of refining coal was minimal compared to the expenses when CROSS was refining coal. They were on the hook to pay expenses, and they did pay expenses in every month where no coal was being produced. Yes, Your Honor. As the tax court found, the tax court concluded that there were $2.9 million in expenses, which is a very small portion of the overall operating expense contributions here. Which makes sense. Most of the costs are variable here. Yes, Your Honor. The vast majority of them are variable. So the gist of your objection seems to be that this looks like a really good deal in months where things are working out. No, Your Honor. The gist of the Commissioner's objection to this is that this looks like a situation where Fidelity and Schneider put a very small amount of money up front, had very small amounts at risk from these operations expense contributions. And then in the context of the anticipated tax benefits that they thought would result here, that is not a substantial factor weighing in favor of this being a partnership. Okay. On the upside part of this, if I may just say a couple of things. First, Fidelity and Schneider did not join CROSS to share in Gallagher's risk. The tax court did find that that was an interest of Gallagher, but Fidelity and Schneider's rational economic actors needed an economic upside out of this investment. And they were totally indifferent to the economic upside of CROSS's operations, except for the tax credits. Now, it's not the IRS's position that there must be a pre-tax profit in this kind of situation. What is required is some kind of economic upside from the underlying business, not just tax benefits. Legitimate partners have meaningful upside potential or a meaningful stake in the operations of the company they are invested in. I'm trying to figure out how that works when you have, as here, a tax benefit that's designed to encourage people to undertake activities that they wouldn't do absent the tax benefit. It wouldn't be profitable, at least pre-tax. And they would have no interest in doing it pre-tax. I just don't understand how you said you don't have to have a pre-tax benefit, but they have to have some interest apart from the tax benefits. Maybe I just didn't understand what you were saying. They're supposed to have pre-tax. So the IRS's position is not that a pre-tax profit is required. But the IRS's position is that there must be some kind of economic upside in the underlying activities of the business. So as an example, in this case, Gallagher's economic upside, there must be an economic upside to the business upon the underlying business. So in this case, Gallagher had the production of this refined coal. Yes. The refining of coal has to be some upside when? Through the operations of the business. So if I may, Gallagher is a good counterexample. So Gallagher had potential upsides and downsides through its ownership of the technology, through its role as a licensor of the technology, through receiving the technology licensing fees from Cross, and through the mechanism of that technology licensing fee, Gallagher was solely exposed to the ups and downs of the operating expenses when Cross refined coal, which was the vast majority of the operating expenses. I think the difficulty is that the way it looked, Gallagher and its lovely technology were going to go nowhere without partners. They weren't going to be able to do anything without partners, because this thing just isn't going to work financially. Even they were not going to be able to do this operationally without other people to come in and share the expenses and share the benefits. So it's a little odd to me to say, let's just look at Gallagher when Gallagher said, I thought I have partners. And Congress said, you know what? We want people to do this, and they won't do it. People won't jump in and get involved in this unless we give them this tax benefit. And I don't understand why it matters that they said, OK, Congress said, we'll make this economically viable for you with a tax benefit. We're willing to do it in light of that tax benefit. Is that your position? That that's when someone said, we're willing to do it because of the tax benefit, we wouldn't do it without the tax benefit, that it is therefore not a legitimate decision to enter into the tax partnership? No, Your Honor, the tax benefit could certainly be part of the calculus. But the question is, did these entities really intend to enter into the business of refining coal together? Ms. Berg, why can a tax credit not be the entire reason for getting into it? If the tax credit is the only thing that makes this type of business economically feasible, why can't that be the only upside potential for the partners? I mean, that seems to be a decision that Congress quite clearly made and then reinforced after 2008 when it took away the enhanced value of coal provision. So I guess, I mean, is the government's position, I mean, I'm just not sure that the government's position is consistent with the creation of these tax credits by Congress. I understand the IRS wants to protect the public fisc and get as many tax revenues as it can, but that doesn't seem to be the policy that was pursued by Congress. Your Honor, Congress was certainly intending to encourage refined coal through the tax credit. There's no question about that. What Congress was not encouraging was for the creation of partnerships to transfer those tax benefits where the purported partners had minimal skin in the game and no economic upside from the underlying business. Here, Gallagher had all of the upside from the refining of the coal and the lion's share of the downside risk as we've discussed. Now, in this court's opinion in ASA Investorings, this court really focused on the fact that the key is a non-tax business motive for forming the partnership. And quoting a 1944 opinion from the Second Circuit and National Investors Corporation, the court wrote that escaping taxation is not business. So the business purpose for Fidelity and Schneider can't just be to reduce their taxes. Is this idea of escaping taxation or evading taxation very different from benefiting from affirmative tax credits, right? I mean, isn't that a different thing? In fact, I mean, it's a very different thing to create a structure to just simply evade tax versus to create a structure to take advantage of tax credits, right? When Congress creates tax credit, it effectively creates a different kind of economic market for the underlying good, right? Here, refined coal. And so there's a business that's simply taking advantage of that different market incentive that Congress has created. Well, Your Honor, with respect to how it works out on the bottom line of a tax return, evading tax and taking advantage of a tax benefit like a tax credit do form the same function. I think it might be. It's very different public policy, though. Well, Your Honor, in terms of encouraging the refining of coal through the tax credit, absolutely. There's no question that's what Congress meant to do here. I mean, Congress did not mean to take advantage of tax credits. It doesn't want people to evade taxes. Yes, Your Honor, but AJGC and this constellation of members of Cross undertook the activity that Congress meant to encourage here. Fidelity and Schneider did not. AJGC invested in the technology. AJGC had all the partnerships with the utilities. AJGC took the risk on not only the technology, but the operations of Cross. And so here, AJGC did it. Could Gallagher have done it by itself? They're finding that Gallagher would have done it by itself. Well, Your Honor, the tax court did find that Gallagher brought in partners to spread its risk, whether it would have done it without partners. But that's probably a fair inference there. Have an interest in doing it by itself. So what Congress wanted to have happen wouldn't have happened if partners didn't come in or seem unlikely to have happened. Your Honor, Congress, in fact, anticipated that people might join together to refine coal. What Congress did not anticipate was that entities could come in and put a very small amount of money into a partnership and reap the tax benefits without really being full participants in the business. I'm sorry, Your Honor. This doesn't feel like a small amount of money, but maybe that's just the salary bracket from which I'm looking at it. It looks like a lot of money. Well, I understand that. Our bottom line is- It's not a token payment. And it was ongoing payments, even whether or not tax credits were being generated. The vast majority of those payments, Your Honor, were not truly at risk. And so when looking at the risk of these entities in cross, those payments and arrears for operating expenses simply shouldn't have been part of the equation. So in context, which is important, it's not my salary that this is in the context of. It's in the context of how much do they put in and how much do they anticipate out of the partnership. And that difference here is quite striking. So thank you very much. Yes, any other questions? Okay, thank you. We'll hear from Mr. Bishop now. Thank you, Your Honor. May it please the court. Just let me put straight that Fidelity and the other partners had exactly the same agreement as to Jeffries, as they did as to cross. And if you look at JA761, that is the membership purchase agreement that applies to all three of the partnerships, cross, Winyar and Jeffries. And at page 779 is the liquidated damages clause that applied equally to Jeffries. And the liquidated damages clause has conditions. You can't exercise it willy-nilly. At Jeffries, the partners did not exercise it within 30 days of the plant being closed down because they had decided that they were going to move the machinery, the plant that they had bought to another utility. And so they didn't exercise the liquidated damages clause in time. When they did pull out, Fidelity lost $2.9 million in after-tax money and Schneider 700,000 in after-tax money. And what Judge Gustafson held here is that at the time when the partners entered into the partnership, they didn't know if tax credits would ever be generated or in what amounts. And they could even have failed to recoup their investment, just what happened at Jeffries. Because there were all these risks, demand risks, regulatory risks, environmental risks that stood between them and obtaining the credits. So Jeffries, I think, shows without question that what we put into the partnership was at risk. And what we put into the partnership, Ms. Springer talks about this being a small amount, what we put into the partnership was exactly what it costs to refine coal. We bought a plant that costs $6 million. We put in a $1.5 million escrow in advance to cover operating expenses. And then we paid those operating expenses each month. And those are the expenses of running an ordinary business. And I can refer the court to JA-955, which is a statement of account for the cross partnership for one month for October of 2010. And it lists what all those expenses are. It indicates the escrow amount at the top and at the bottom. And it talks about all the expenses that we pay, which are payroll, rental, materials, the chemicals, safety services, the cost of running an ordinary business. And that's what we were doing. In ASA, I'm sorry, Josh Katz is. Yeah, I was just gonna take you to ASA. So your position makes a lot of intuitive sense for the reasons my colleagues have explored. Congress wants this kind of activity to be undertaken and you all are undertaking it. But ASA has this very broad language, which says that either the transaction, which is the underlying production of coal, or the entity, which is the creation of the partnership here, is a sham in the absence of a non-tax business purpose. Yes, right. How do we make sense of that language in these cases where no one would have undertaken any of this, Cross or anybody else, without the tax credit? So in some sense, none of this happens without a tax purpose. Yes, Your Honor. Well, no, it's true that a tax court found that there was no incentive, that it was uneconomic to enter into this business without the credit. But at the same time, there is a non-tax business purpose here. And that is to refine and sell coal that meets the standards that Congress has laid down. And what this court said in ASA and BCP, when it was contrasting this non-tax business purpose, was it drew a contrast between business in the ordinary meaning, that's a quote in ASA from Learned Hand, and transactions that are so structured, structured in the extreme, such that they are just a facade. And then it talks about that sort of business as being essentially a worthless business. And again, in BCP, again, this contrast between a non-tax business purpose and a real business, it talks about practical economic effects of the business apart from tax effects. Now, if you look at those things, business in the ordinary meaning, was this a facade? Are there non-tax business effects? The answer is, yes, it's not a facade. We have a plant, we have employees, we refine coal at 94% of our revenue comes from the sale of refined coal to the utility. Only 6% of our revenue is from the credits. And again, referring the court to that document at A955, there are an awful lot of economic effects in there that have nothing to do with tax, paying our employees, buying the chemicals. We are running a real business, we are putting into that business exactly what it takes to run a refined coal business. And what we are getting out of it is two streams of revenue. One is for the sale of the refined coal, and the other is the tax credit. And the tax credit is exactly in the amount that Congress specified you should earn per ton of refined coal. So even though no one would, no one, not just us, no one would enter this business without the incentives that Congress provided to encourage this activity. In order to get there, you have to run a real business which has its own real economic effects. So that's my suggestion, Judge Katsas. And obviously the context in ASA and BCP is nothing like that. In those cases, you're on the structured side of the transaction where there is no point to the business other than to exploit tax rules that are not incentive rules like the refined coal credit, but that are for some other purpose entirely. In ASA, it was the installment rules. In BCP, it was contingent liability rules. So nothing to do with the particular activity, but you squeeze a fake business in a papered structured transaction to take advantage of those rules. We are doing exactly what Congress incentivized and spending exactly the amount of money that it takes to run a real refined coal business on those credits. Thank you. You had argued about the commissioner's mistake being that it wasn't looking at a risk-adjusted, I think you call it a risk-adjusted ratio between the investment and the tax benefits. Right? I might not be describing it just right, but you thought there should be a risk adjust. You know, the government sort of had the best- Well, no, no, no, no, Your Honor. No, it's all relevant. I mean, that's the beauty of the Culbertson text. You take all of this into account. Here, and as the court recognized, there may be cases where the disparity could be telling or where the lack of non-tax profit could be telling. The beauty of Culbertson is you take everything into account. But the tax court here made findings as to the projected amount of the benefit, the actual much smaller amount of the tax benefit that was received, and the amount of money that we invested. And it didn't use the word ratio, which the government seems to think is a legal requirement, but it considered all of those facts. And what it found was that in context, we were putting in the amount of money that the investment that was required to run this business and that the after-tax benefits that we got were a fraction of our projections because risks that we knew about, risks that we knew about as a result of our due diligence came to pass. I'm trying to figure out when we're sort of looking at investment and discounting by risk. And then in BCP, we looked at not the projected tax benefits, but the claimed tax benefits. And yet the inquiry is supposed to be, as I understand it, the intent when entering into the partnership. So looking at claimed tax benefits or projected tax benefits. No, look, the district, the tax court here found that we were aware when we entered into the partnership as a result of our extensive due diligence of the risk. We were even aware of the bromide risk. We were aware of the demand risk. We were aware of the regulatory risk. So those projections, the district court said, were a best case scenario and they depended on operating at full production over the full 10 year period. We knew that that wouldn't happen. We couldn't put a number on that. We did put on an expert at trial who ran Monte Carlo analysis to show what the real, the range of losses and gains could be. The partners didn't do that, but they knew that they had significant risks. And so the best indicator here of what we could have anticipated at the worst at the time when we entered into this partnership are the $19 million that all three partners received between them as tax benefits or the situation in Jefferies where demand dissipated and the partners lost $3.5 million. So I agree, Judge Millett, there's no doubt that an initial prediction, particularly in a case where everything is structured, where everything is fake, all right? This is a paper transaction where there's no real risk, where there's no upside that isn't controlled, where returns are guaranteed, fixed returns are guaranteed. Those sorts of situations that of course, the unvarnished projection may be very, very telling, but here the partners knew of the risks and knew that that projection was subject to actually refining and selling coal and all of these problems that arose, the loss of the permit and the shutdown for three years because of the bromine, those have to be considered as well in this situation. That's the beauty of Culbertson, Your Honor, that Culbertson, which the tax court faithfully applied here, allows you to take all of these into account. Ms. Bringer's theory here, which imposes these sort of fixed rules on top of Culbertson doesn't, and really doesn't allow you to account for the fact that this is conduct that Congress is encouraging. I'm not sure that that's what she's proposing as opposed to trying to put some meat on the bones of sort of anticipated recoveries and risks factors, prospect recovery factors under Culbertson. I mean, there has to be some meat on the bones and some way of actually comparatively analyzing those. If that's what their ratio and stuff is seeking, then that wouldn't be illegitimate. It's just whether it was appropriately adjusted for risk or not when they had their best case scenario. Well, I agree absolutely, Your Honor, that all of those, the amount of projections, the amount of actual returns, the knowledge of the partners as to the risk when they made the projections, those are all relevant factors. But as I read the government, it thinks that that ratio is determinative. And that's just not the case under Culbertson. And it doesn't allow courts to take account of the disparate facts in cases like this, which is an unusual case. We have real partners who is the textbook found were engaged day-to-day in the operation of this business. Any decision to spend more than $5,000 had to be passed on by all three of the partners. They were engaged on a day-to-day basis in operating a business and paying its expenses. And I do wanna address just on the operating cost issue, because Ms. Bringer did bring up this claim again that the operating expenses were not really at risk. And that's wrong. And it's wrong for two reasons. It's wrong because there was an escrow that we funded in advance for a million and a half dollars. And as the document at 955 shows that we replenished that escrow each month. So we were actually paying in arrears. But more important than that, when we refined the coal, the credits accrued, they weren't earned. And in fact, the government in this case, in its answer, section 7G of its answer, did not concede that the refined coal here was qualified. That is that it met the emissions reduction requirements of the statute. At trial, it put on an expert witness who said that the lab testing that we did was inadequate. And that in order to qualify, the testing should be done at the stack. Trial counsel tells me that they did not know until the government's closing argument in this case, that the government was not going to challenge the qualification of the coal. In another one of these cases, which is under audit at the moment, the government is challenging qualification of the coal. We had absolutely no guarantee at the time when we produced this coal that we would ultimately be allowed the credits over this qualification issue. And the trial showed that to be the case. So all of those operating contributions were at risk and should not be discounted, essentially ignored altogether, which is what the government would like to do here. Okay. My colleagues have any other questions? All right. Thank you very much, Ms. Bringer. We'll give you two minutes for rebuttal. Thank you very much, Your Honor. I appreciate that. As an initial point, Judge Katz has asked about non-tax business purpose. And the non-tax business purpose that is relevant here is for the formation of the partnership. And was there a non-tax business purpose to form the partnership? As discussed earlier, Fidelity and Schneider did not have a non-tax business purpose to join this partnership. Their only reason to join this partnership was for the tax benefits. In addition to that, they knew- Why is that? Why do you reach that conclusion with regard to Fidelity, but not with regard to AJC? I mean, you can look at this one of two ways. One way of looking at this is, as Mr. Bishop said, they're doing real stuff. They're running a business. They're producing coal. And that counts as a business purpose, even if the business would not be profitable, but for the tax benefits. Or the other way you can look at it is you can understand the phrase non-tax business purpose to mean that the enterprise or the partnership have to make sense without regard to tax benefits. And that seems to prove way too much, including that AJC wasn't legitimately engaged in a business. Your Honor, AJGC had a number of ways to have a possible upside from this business, through its investment in the technology, through the possibility of reducing operating expenses, which would have inured entirely to AJGC. So AJGC is in a really different position from Fidelity and Schneider when it comes to the business of producing coal. And the question- Are you saying they might have gotten into this business, but for the tax credits? No, Your Honor. The point is that AJGC had an economic upside potential, for example, from reducing operating expenses at cross. Fidelity and Schneider both had employees who testified that through the technology licensing fee, it provided an incentive for AJGC to reduce costs. So Gallagher is really the entity that's engaged in the activity that Congress meant to incentivize here, which is the production and refining of refined coal. Now, context matters. And it seems that there's a fair amount of agreement in the argument today that the tax court should have considered the downside risk versus the upside. And whether that's the anticipated tax benefits, according to the documents that were introduced at trial, whether that's some kind of risk-based assessment, which there's no evidence of in the record here, but even if that's the proper comparison, the fact is the tax court simply didn't consider that. And not only did it not consider that, it mistakenly thought that Culbertson barred that kind of contextual comparison. And that was a significant error in the tax court's opinion here. At the end of the day, Congress did indeed want entities to refine coal and sought to encourage that through the refined coal credit. But Congress did not intend for the formation of invalid partnerships to share those tax credits by abuse of the partnership form. And in the commissioner's view, that's what occurred here. Are there any further questions? All right. Thank you very much, Ted. Thank you very much. For the helpful arguments and the cases submitted.
judges: Millett, Katsas, Rao